Filed 8/31/22  Marriage of Inna and Roman A. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re Marriage of INNA and ROMAN A. | B311140 |
| INNA A., | Los Angeles County Super. Ct. No. 18CHFL00936 |
| Appellant, | |
| v. | |
| ROMAN A., | |
| Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Michal R. Amerian, Judge.  Affirmed.

Law Offices of Gregory R. Ellis and Gregory R. Ellis for Appellant.

No appearance for Respondent.

Inna A. challenges the trial court's final custody and visitation order awarding her former spouse Roman A. sole physical custody of their teenaged son and daughter without providing Inna structured visitation or reunification therapy with the children. We find no abuse of discretion and affirm.

## BACKGROUND

### 1. *Dissolution petition and initial custody dispute*

Inna and Roman were married in January 2004. They have two children—their son G., born in October 2004, and their daughter E., born in December 2005. The couple separated in February 2018. Inna then petitioned for dissolution in May,[1] and Roman moved out of the family home.

Initially, Inna asked the court for sole physical custody of the children with visitation for Roman. Roman, on the other hand, sought sole physical custody of G., with visitation for Inna, and joint physical custody of E. Both agreed to joint legal custody of the children.

For the upcoming summer break, the couple agreed to share physical custody by alternating their custody time every two weeks. Roman did not have an apartment yet, so the children spent the night at the family home with Inna during his custody time. He took the children to various activities during his two weeks each month that summer, including the beach, the movies, shopping, and dining out.

---

[1] On August 26, 2019, the court granted dissolution and bifurcated all other issues, including custody and visitation. On October 23, 2019, the court entered a judgment of dissolution as to status only, reserving jurisdiction over all other issues.

2

Roman worked as an Uber driver, which afforded him a flexible work schedule, and he made more money driving in the evenings and on weekends. Inna worked full-time. During the week, she dropped the children off at maternal grandparents' home and picked them up after work. Roman said the children would "play[ ] on their phones" all day, and he "often" would pick them up at their "request" and spend time with them.

On August 20, 2018, Inna filed a request for order (RFO) seeking temporary primary physical custody of the children, then ages 13 and 12. She had been unable to reach a structured custody agreement with Roman and did not agree with his request for primary custody of G. Inna also stated that, when the children are with Roman, "it appears he is restricting their cell phone use or access, making it very difficult for me to contact them."

In his September 20, 2018 response to the RFO, Roman asked for primary physical custody of both children with visitation for Inna. He denied having restricted the children's telephone time with their mother, and declared he had encouraged them to communicate with her. At the end of August, Roman had rented a two-bedroom apartment, and G. had been living with him full time ever since.[2] He described G.'s complaints about Inna, and Inna's "difficulty exercising parental control over the children." Roman declared that, although he encouraged G. to speak to and spend time with Inna, G. had neither seen nor had much communication with his mother

---

[2] Each child had a bedroom, and Roman slept in the living room.

since he moved in with Roman. Roman asked the court to allow G. to address the court about his preference to live with him.

Inna in turn declared Roman called her names in front of the children, and G. had started to mimic his disrespectful behavior. She did not know why G. was angry with her; he would not answer her calls. She wanted to attend counseling with G. but said Roman would not agree.

By the October 10, 2018 hearing on Inna's RFO, the couple had temporarily agreed to share physical custody of E. on alternating weeks. G. still refused to see or talk to Inna. A week before the hearing, he had begun to text message his concerns to her. The parties agreed Inna would have visitation with G. on Mondays and Wednesdays from 6 p.m. to 8 p.m., with Roman to drop G. off at Inna's and Inna to drive him back to Roman's. The court ordered G. to attend therapy sessions—initially alone and then with Inna or others at the therapist's discretion. The court continued the matter for a status conference on January 9, 2019.

At the January 9, 2019 status conference, Inna's counsel explained G. had begun therapy with an agreed-upon therapist, Dr. Walton. Roman objected to Dr. Walton conducting joint therapy sessions between G. and Inna, however, and did not consent to Dr. Walton providing a report to the court. Roman believed Dr. Walton was attempting to force G. to participate in therapy with his mother before he was ready. He filed a complaint against Dr. Walton with the licensing board.

The court expressed its frustration: "I'm disappointed that the therapy option turned out to be not just a dead end, but almost it seems to have made things worse. That tells me something about the level of conflict between everybody involved

4

for it to ultimately result in a complaint being filed against the very doctor that the parties had agreed upon. That's extremely troubling to me." Given the level of conflict and the parents' different perspectives, the court appointed minor's counsel for G. under Family Code section 3150.[3] Roman's counsel again asked the court to hear from G. about why he was upset with Inna before appointing minor's counsel. Mother's counsel objected.

The court ordered a new visitation schedule for Inna and G. in the spring: four consecutive Fridays from after school until Saturday at 9 p.m., starting April 12, 2019, followed by the second and fourth weekend of each month, from after school on Friday until Sunday at 8 p.m., starting May 10, 2019. The court ordered Roman to produce G. for visitation, and if G. did not follow the schedule, he was required to complete three therapy sessions.

With this new schedule, Inna believed G. had become more comfortable with her and appeared to look forward to his time with her. The visitation went well until June 21 when G. stopped appearing for his visits. E. also became more disrespectful and hostile toward Inna and Inna's family.

At a July 22, 2019 hearing, minor's counsel reported visitation had been "going okay for a while, and then it kind of went sideways." Inna had not seen G. for at least a month. On July 12, 2019, he refused to come down when Inna arrived to pick him up. Roman was not home. G. also had not begun therapy despite the missed visits, as a new therapist had to be selected. The parties finally chose Dr. Bissada.

---

[3] Undesignated statutory references are to the Family Code.

E. now was saying she didn't want to see Inna either. On July 20, she apparently had a complete " 'meltdown' " at her mother's home, yelling and screaming, " 'Dad hates you, we all hate you and I hate you.' "  The court therefore ordered both children to begin therapy with Dr. Bissada immediately.

Roman asked the court for direction.  He said neither G. nor E. wanted to go back to Inna's, and he could not exactly "put 13- and 14-year-old kids in [the] car and take them to her." The court explained, "I think . . . the best thing to do is to tell your children that they are expected to go to the visits with their mother; and that, if they have any question about that, that they should call" minor's counsel.  The court modified its appointment of minor's counsel to include representation of E.

A few days later, on July 26, 2019, Inna went to pick up the children from Roman's; they did not show up.  E. texted Inna that she was not coming; neither G. nor Roman responded to Inna's messages.  The children also had not begun therapy because Dr. Bissada would not see them unless there were " 'safe harbor' provisions in place" given Roman's complaint against Dr. Walton.

## 2. *Custody evaluation*

On August 26, 2019, Inna filed an ex parte RFO asking the court to order a private custody evaluation by a clinical psychologist under Evidence Code section 730.  Both children were refusing to see their mother.  Inna contended Roman had manipulated and intimidated them.  The court concluded that, given G.'s resistance to therapy and the court's orders, a child custody evaluation was reasonable.  The court granted Inna's request and ordered the parties to exchange names of possible evaluators.

6

The court appointed Dr. Shirin—one of the evaluators Roman proposed—to conduct the evaluation. The court directed the evaluator to focus on "the children's relationship with both parents, specifically their refusal to visit with their mother[,] and allegations their father has alienated them from their mother." The parties agreed Dr. Shirin's report would be admissible and could be entered in evidence without further foundation, and waived any potential hearsay objections to the report.

Dr. Shirin interviewed each family member, between November 2019 and February 2020; conducted psychological testing on Inna and Roman; reviewed documents provided by the parties; and spoke to "collaterals." Dr. Shirin submitted his confidential custody evaluation[4] to the court on July 30, 2020.[5] Dr. Shirin observed that the children idolized Roman and mimicked his thinking and behavior, including his "verbal demeaning" of Inna. In Dr. Shirin's professional opinion, Roman did not "see how his thinking and behavior has and/or would alienate his children from their mother" and believed the children were "free to make up their own mind[s]." He explained Roman would have to "use the fact his children idolize him to help facilitate the change in behavior of the children towards their

---

[4] We granted Inna's request under rule 8.47 of the California Rules of Court to file under seal the confidential custody evaluation report and the reporter's transcript that mentions aspects of the report. Accordingly, we have minimized our discussion of the report's details.

[5] Dr. Shirin's report was delayed due to the onset of the COVID-19 pandemic.

7

mother." Dr. Shirin opined, "[I]t is going to be paramount [Roman] changes from his passive stance to an active participant to allow the reunification to work."

Dr. Shirin recommended joint legal custody of the children continue; each parent participate in individual psychotherapy with a therapist trained in high conflict divorce; both parents enroll and actively participate in a co-parenting class; and the children enter into "reunification therapy" with a professional with extensive training in reunification. The goal of "this reunification" was to reunify the children with Inna and move toward "a 50/50 [physical] custody situation."

### 3. *Trial on custody and visitation*

On November 5, 2020, the court held a trial on custody and visitation. By then, Inna had not had visitation with her children in more than a year. G. was 16 years old, and E. was 14, almost 15, years old. They testified over Inna's objection.

G. told the court he did not want to go back to Inna's house or see her. He thought Inna acted "fake" and lied about "little things"; had an "attitude" and was "a little demeaning"; treated him like a "stranger"; argued with him about everything; had chosen her family over him; and took her "family's side" over his and did not believe him. G. did not believe Inna loved him based on the way she acted; she "[did] not act like a parent or a mother."

When asked about going back to therapy with Inna to try to heal the relationship, G. said, "No. That's impossible." He essentially told the court he would not go back to therapy, or visit with Inna, even if ordered to do so—that it would be "okay" to violate the court's orders because he was "tired of it" and "[i]t's not right." He told the court the last therapist told

8

Inna "everything" G. "[didn't] like" about her and "some things that she should fix," so she had a "whole list" of "things to improve on." G. thought Inna should work on improving those issues and "fix her attitude" "on her own time."

When asked why she refused to spend time with Inna, E. told the court she didn't "want to deal with her arguments or her attitude." She "prefer[red] being comfortable at [her] dad's house than wasting [her] time arguing with [Inna] at her house." E. did not want to have a relationship with Inna right now. E. said Inna blamed and judged her and didn't really show her affection.

To be a better parent, E. thought Inna should stop arguing with her about "every little thing"; spend more time with her; take time off work and "make it seem like she actually cares about me more than she does her work"; take her "side"; and stop talking bad about her in front of relatives. E. believed Inna had chosen her family over E. because Inna spent more time talking to her relatives than to her.

E. also thought therapy was "a waste of [her] time." She said, if Inna were willing to listen and change, then she was willing to tell her mother "what she did wrong" one-on-one. Unlike her brother, E. did not think it was okay to break rules or the court's orders, but said she "just . . . can't go to her house" or "deal with her." She described going to Inna's as "just a headache" and a "pain in my butt." E. was "fed up with [Inna's] attitude and the way that she runs everything." Like G., E. did not believe Inna loved her; she thought Inna's expression of love and affection "didn't really seem real." E. described herself and G. as "really stubborn kids." In the end, E. said she'd try to give whatever the court ordered "a chance."

Both G. and E. said their father encouraged them to go see their mother and denied having heard him make negative comments about her. They testified Roman told them they could decide with whom they wanted to live.

E. said she blocked her mother's number from her phone because she got tired of getting text messages from her. G., on the other hand, simply did not respond to Inna's texts or calls. Neither child felt he or she needed to be protected from Inna.

After the children testified, the court heard argument. Inna's counsel noted there had been no testimony about abuse, neglect, or "egregious behavior," only that "mother argues, and she has an attitude." Counsel argued that, because the children were so against therapy, the court should order intensive reunification therapy between the children and Inna with a professional knowledgeable in parent alienation.[6] Roman's counsel disagreed.

The court agreed with Dr. Shirin's observation that the children took "their cue from father." The court thus believed it "important that whatever plan we do going forward, that [Roman] realizes that his children absolutely do idolize him and that . . . he is extremely influential over them, not just by what he says but by what he does. So that if [Roman] conveys a positive impression of whatever plan the court orders, that

---

[6]     The proposed reunification therapy with a parent alienation specialist would involve intensive all-day sessions over several days in a row. The children would have no contact with their father during the entirety of the therapy and would stay with Inna at night.

10

positive opinion of that plan will carry over to the children and might help break down some of their stubbornness."

The court believed "the children consciously or subconsciously" had "internalized" the conflict between their parents and "a lot of the bad feeling that father has towards mother." The court did not believe Roman "ha[d] alienated the children in the truest sense of the word," but believed "that has occurred." The court explained, "there were times when I almost felt like I was listening to a former spouse express their dissatisfaction with their former significant other and in a way that didn't seem age appropriate."

The court queried, "[T]he question is how to break down the children's feelings of alienation, whether they're justified or not. . . . So obviously, we need to break down their resistance and their stubbornness. [¶] . . . [¶] So I really am, and we all are counting on [Roman] to set the right tone. . . . I feel like we almost have one shot at this, and it's going to take a very aggressive approach to try and break down these walls that the children have built up. [¶] And given their age and the strength of their feelings, that's why I believe we have one shot, and we need to take our best shot at repairing this relationship, or else it's going to just be on the children's own timetable, and I'm not sure that's healthy for anybody."

Roman's counsel argued G. should not be forced to go to therapy or see his mother. Instead, counsel believed "the door should be left open" for G. to choose to participate. Because the children, especially E., wanted Inna to show them she had changed, Roman's counsel suggested the court order Inna participate in individual therapy, and the therapist could choose

to invite one or both children to a session to talk with their mother.

Inna's counsel agreed the children said their father told them to visit Inna, but noted Roman also had said he "can't make them go." Counsel asserted parents do "have to make [their children] do things that they may not want to do." Counsel argued the adults "need to set the rules, set the boundaries; and [the children] have to do what the adults say they have to do." Counsel thought if the children and Inna were in the intense therapy she proposed, which was different from any therapy they had been exposed to earlier, "it m[ight] turn them around."

Minor's counsel didn't think there had been evidence of alienation by Roman, but agreed with Inna's counsel that "all the blame [was] not necessarily on mother." For example, E. had said she went to live with Roman after an argument with Inna when Inna told E. she could not go to the mall with her friends. That wasn't a good reason to refuse to see Inna in minor's counsel's view.

Minor's counsel believed if the court ordered therapy, both children should go. He was unsure about the intensive therapy Inna's counsel proposed. He thought the court could order some therapy between the children and their mother but noted Roman would have to encourage the children "a lot." He was skeptical it would work, but thought "one last attempt at something like that is probably at least worth a chance, worth a shot." He believed any visitation with mother would need to proceed incrementally.

Minor's counsel had been unable to pinpoint exactly what led to the breakdown in the children's relationship with Inna. The court thought it "seem[ed] like their resistance [was] disproportionate for the circumstances." The court thus could

understand why Inna blamed Roman—the person with whom the children were spending their time. The court, however, did not "see any explicit and overt evidence that father [was] actively trying to undermine the relationship." The court noted the children "obviously, have strong feelings; but it's just confounding that it would be this strong under the circumstances."

Inna's counsel noted Dr. Shirin had opined that Roman did not understand his role in the children's alienation from mother. She argued parenting classes and therapy for everyone was the best course under the circumstances. The court disagreed. It found the children's responses credible and did not "get the sense that they had been programmed." The court understood the children were protective of their father but did not believe "they were trying to contrive an answer that would be protective of him."

Minor's counsel thought the children had made up their minds: "It's almost like the refusal to visit—the stubbornness has taken on a life of its own." The court agreed. Counsel did not think the intensive therapy would work out well. He noted that, assuming someone could "actually get them there, once [the children] understand it's going to be that intensive, after the first couple hours, I think it's going to go south real quick." He favored a finite number of family therapy sessions between the children and their mother with the ability for the children to continue at their option.

The court agreed with minor's counsel: whatever feelings the children had developed against mother due to their parents' divorce had "really taken on a mind of their own that [was] disproportionate to the actual evidence of alienation." The court did not believe the evidence of alienation by Roman "[was] so

13

strong as to warrant the type of intensive almost boot camp like approach that has been proposed by mother."

In the end the court found it was in the best interests of the children not to force them to spend time with their mother. The court wanted both parents to attend a 12-session high conflict parenting course together. The court expected the parents, by attending the course together, to show their children that they believed it important for G. and E. to have a relationship with both parents. The court also ordered Inna to participate in a minimum of three therapeutic sessions and that the children then be given the option to join her for future sessions. The children also could visit her at any time that was mutually agreeable.

The court suggested to Inna that, "on a semiregular basis . . . basically hold out an open hand to [the children] and maybe invite them to go have dinner on a day or two," and "not [to] take offense if they keep on saying no." The court believed knowing Inna was there for them, was not abandoning them, and was not angry with them might make the children feel comfortable to renew their bonds with her. Inna responded she had been doing that for the past 15 months, but the children had blocked her, and there was no channel for her to communicate with them. She said she had tried setting up dinners through minor's counsel, but the children wouldn't go.

The court acknowledged Inna's frustration. The court explained "the impulse that we have as judges is to fix, do something. Sometimes the best thing to do is to do nothing and just let time and space give that." Inna was distraught. She lamented, "I'm just trying to—not to lose anymore time apart, because that's only going to create much more

14

psychological trauma to [the] children. Because that's all I'm thinking about is how is the 16-year-old and 15-year-old is [*sic*] going to come around, and then it's 18 years, boom; and we haven't seen our mother, and we don't have to anymore."

The court clarified its visitation order: "I think it's the structure that they're bristling at, and I think that—obviously, it's a fine line between empowering them too much versus giving them enough control where they buy into the idea, and that's why I'm eliminating the actual structural requirements about visits." The court ordered both children to ensure their mother's information was unblocked from their phones so she could reach out to them.

Inna's counsel reminded the court Inna had never had a therapy session with the children—if she had some type of therapy with them, she at least could say she had done what she could. Counsel continued, "Doing nothing just seems like she's throwing her hands up in the air and giving up." The court reiterated, "I just don't think now is the right time to try that kind of intensive approach. And if we don't do it now and we give this, say, six months, it doesn't mean that we can't circle back and try that intensive approach again. But right now . . . I think that's going to be extremely counterproductive."

Counsel also believed the court had not considered the custody evaluation report and had based its orders only on the children's testimony. The court responded, "Yes, I am giving weight to . . . the testimony I received from them this morning. It's not that I'm disregarding Dr. Shirin's report entirely. I think I'm mindful of the need for the parents to address their own issues, which is why I'm ordering the 12 high conflict parenting classes and for them to do it together. But I don't think that . . .

having structure right now is—is in their best interest . . . [¶] after talking to them."

The court stated its goal was "to create an environment where the children believe that—and where the children want to go back with mother." The court made clear it was not blaming Inna. Rather, the court was "trying to create psychological space for the children to feel the urge and hopefully natural instinct to want to return to their mother and have some form of a relationship to build off of." The court continued, "I'm trying to give everyone maximum flexibility. . . . [¶] I've already said why I believe these orders are in the best interest of the children."

Inna asked the court directly, "Do you think [the] children not spending more time with me or spending any time at all is good for [the] children?" The court answered, "No. But for the reasons I already stated, I think that forcing them—given their age and given their feelings, I feel that forcing them to do something—to visit with you on a structured schedule is going to have a counterproductive effect. . . . If I didn't believe that they should be with you, I wouldn't have made the orders that I've been making for over a year and that I've been trying to enforce for over a year. [¶] So yes, in principle, . . . I agree with you. But now I believe, after hearing from them and reviewing the report that, in order to accomplish that goal, which I share with you, that having less strict orders is the way to do that." The court agreed with Inna the children needed both parents, which was why it gave Inna joint legal custody.

After hearing from all counsel, the court ruled its custody and visitation order would be a final order under *Montenegro v. Diaz* (2001) 26 Cal.4th 249, in the interest of finality and closure.

The court's minute order states: "Court finds it is in the best interest of the minor children to not force them to spend time with their mother, so there will not be a structured schedule."

On January 8, 2021, the court signed and filed the final order after hearing. The order awards joint legal custody of the children to Inna and Roman with physical custody to Roman and requires Roman to co-parent with Inna. The order also awards "[r]easonable right of visitation" to Inna with visitation time to be "arranged by mutual agreement of the parties." The order requires both parents "to attend a 12-session high conflict parenting class together," requires Inna to begin individual therapy—a minimum of three sessions, and orders the children to ensure Inna can contact them telephonically and to unblock her access to their phone numbers.

On February 17, 2021, Inna petitioned for a writ of mandate reversing the final custody order, which we summarily denied. Inna also timely appealed from the final custody order.[7]

**DISCUSSION**

Inna contends the trial court legally erred and abused its discretion in denying her joint physical custody of the children and failing to order structured visitation. She also contends the court abused its discretion in refusing to order the children

---

[7] The January 8, 2021 custody and visitation order is a final appealable order. (Code Civ. Proc., § 904.1, subd. (a)(14) [appeal may be taken from "a final order or judgment in a bifurcated proceeding regarding child custody or visitation rights"].) In an abundance of caution, Inna also appealed from the March 16, 2021 final judgment on reserved issues. On Inna's motion, we consolidated the two appeals for all purposes.

17

to attend reunification therapy with her.  Inna argues the court's final custody order was not in the best interests of the children.

**1.    *Applicable law and standard of review***

"Under California's statutory scheme governing child custody and visitation determinations, the overarching concern is the best interest of the child." (*Montenegro v. Diaz* (2001) 26 Cal.4th 249, 255.)  The trial court has "the widest discretion to choose a parenting plan that is in the best interest of the child." (§ 3040, subd. (d) [statute establishes no preference for or against "joint legal custody, joint physical custody, or sole custody"].) In making its determination, the court "must look to *all the circumstances* bearing on the best interest of the minor child." (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 31–32 (*Burgess*).) Among other factors, the court must consider "[t]he health, safety, and welfare of the child," and "[t]he nature and amount of contact with the parents."  (§ 3011, subd. (a)(1), (3).)

"[I]t is the public policy of this state to ensure that children have frequent continuing contact with both parents after the parents have separated, dissolved their marriage, or ended their relationship, and to encourage parents to share the rights and responsibilities of child rearing in order to effect this policy, except when the contact would not be in the best interests of the child."  (§ 3020, subd. (b).)  Thus, "the court shall grant reasonable visitation rights to a parent when it is shown that the visitation would be in the best interest of the child, as defined in Section 3011, and consistent with Section 3020."  (§ 3100, subd. (a).)[8]

---

8      Inna seems to assert the court had to grant her reasonable visitation rights *unless* it found visitation would be *detrimental*

18

In making a custody or visitation order, the court also must "consider, and give due weight to, the wishes of the child" if the child is of "sufficient age and capacity to reason so as to form an intelligent preference as to custody or visitation." (§ 3042, subd. (a).) And, unless the court finds it is not in the child's best interest to do so, it must allow a child aged 14 years or older to address the court about custody or visitation if the child wishes. (*Id.*, subd. (c).)

We review custody and visitation orders under the deferential abuse of discretion standard. (*Burgess, supra*, 13 Cal.4th at p. 32.) "The precise measure is whether the trial court could have reasonably concluded that the order in question advanced the 'best interest' of the child. We are required to uphold the ruling if it is correct on any basis, regardless of whether such basis was actually invoked." (*Ibid.*; see also *In re Marriage of Connolly* (1979) 23 Cal.3d 590, 598 [general test for abuse of discretion is "whether or not the trial court exceeded the bounds of reason, all the circumstances before it being considered"].)

To the extent Inna challenges the trial court's factual findings, we review them for substantial evidence. (*Chalmers*

---

*to* the best interests of the children. Former section 3100, subdivision (a) did state that. (Former § 3100, subd. (a), enacted by Stats. 2013, ch. 263, § 1, operative July 1, 2014 ["[T]he court shall grant reasonable visitation rights to a parent unless it is shown that the visitation would be detrimental to the best interest of the child."]) The current version of the statute was in effect when the court made its order. (See Stats. 2018, ch. 941, § 4, eff. Jan. 1, 2019.)

*v. Hirschkop* (2013) 213 Cal.App.4th 289, 300; *In re Marriage of Fajota* (2014) 230 Cal.App.4th 1487, 1497.) "We view the evidence in the light most favorable to the ruling, giving it the benefit of every reasonable inference and resolving all conflicts in support of the judgment. [Citation.] We defer to the trial court's credibility resolutions and do not reweigh the evidence." (*R.M. v. T.A.* (2015) 233 Cal.App.4th 760, 780.) Where substantial evidence supports the ruling, we will not disturb it, "even if the record can also support a different ruling." (*Ibid.*)

**2.      *The trial court did not abuse its discretion when it did not order structured visitation for Inna and awarded sole physical custody to Roman***

Inna contends the court abused its discretion in giving Roman sole physical custody and Inna no enforceable visitation for several reasons.[9] She argues the court based its custody order on the "difficulty of enforcing" a joint custody or visitation order, and the children's "stated intentions to disobey any order"; the order conflicted with the court's finding that a relationship with Inna was in their best interests; substantial evidence did not support finding no structured visitation or mandated therapy with Inna was in the children's best interests; the court essentially "abdicated its judicial authority to the children"; and "the court could and should have imposed more substantial consequences on *Roman* for the children's failure to obey the court's custody or visitation orders."

---

[9]      For the reasons we conclude the court did not err in entering its visitation order, we also conclude the court did not err when it did not award joint physical custody of the children.

a. *The court applied the best interest standard in making its custody order*

First, we disagree with counsel's characterization that the court made its custody order simply because it would be difficult to enforce an order requiring structured visitation with Inna. Based on our review of the record, the court's decision not to order the children to participate was made after deliberation and with the children's welfare in mind—not a mere acquiescence to their wishes.

The court naturally considered the children's past resistance and stated intent to disobey the court's visitation or therapy orders when deciding what the plan going forward should be. But, the difficulty in enforcing an order to require the children to spend time with Inna was not the reason for removing the structure from the ordered visitation, as Inna implies. As reflected in the record, the court thoughtfully and carefully considered whether forcing the children to visit with Inna on a structured schedule (or go to therapy) would further the goal of repairing the children's relationship with their mother. After the court interviewed the children, considered the custody report, and heard from the parties and counsel— including minor's counsel—the court determined it would not.

The court noted it had "tried the firm hand approach," to no avail. After talking with the children, the court "[didn't] believe a firmer hand [was] going to have any better result." In the court's judgment, given its past orders and the children's ages and extreme feelings, forcing the children to reengage with Inna would be "counter-productive." The court explicitly found having structured visitation was not in the children's best interests "right now." The court explained to Inna, "[A]fter hearing from

21

[the children] and reviewing the report," having "less strict orders" was the best way to accomplish the goal of having the children spend time with her, and thus in the children's best interests.

Nor did the court's order contradict its finding that spending time with and having a relationship with their mother was in the children's best interests. As Inna notes, "[f]requent and continuing contact between a child and the noncustodial parent is good in itself. . . . [because] it facilitates overall involvement by the noncustodial parent in a child's life and that is good for the child." (*Wilson v. Shea* (2001) 87 Cal.App.4th 887, 890–891, 894–895 (cited by Inna) [increased visitation necessary for noncustodial parent where custodial parent moved away and actively had interfered with noncustodial parent's relationship with their child].) That was the goal of the court's custody order—"to create an environment where the children . . . want to go back with mother" and have her in their lives.

Although it may seem counterintuitive, by "eliminating the actual structural requirements about visits," the court was attempting to *increase* the chance the children ultimately would spend time and reunite with Inna, which was decidedly in their best interests. In other words, by giving these teenagers some "psychological space," the court was trying to, in Inna's words, "incubate the emotional bonds" between the children and their mother to preserve the possibility of a relationship. The court's findings that the children would suffer harm if they lost their relationship with their mother, and that it was in the children's best interests not to be forced to spend time with her, thus were not mutually exclusive.

b. *The court reasonably could conclude unstuctured visitation was in the children's best interests*

Substantial evidence also supports the court's finding that unstructured visitation was in the best interests of these two teenagers at the time. The children's strong negative feelings toward their mother, the court observed, were disproportionate under the circumstances. For example, the impetus for G.'s moving in with Roman was Inna having taken E.'s side when they fought over E. using his video game console and E. took a "swing at [him]." E. refused to return to Inna's after an argument about not getting to go to the mall with her friends. Many of the children's complaints about Inna—primarily her "attitude" and tendency to argue with them—did not seem to warrant their total rejection of her. The court was "confound[ed]" by the strength of the children's feelings under the circumstances.

The court was cognizant that, to repair the relationship with Inna, they would have to "break down their resistance and their stubbornness." The court made clear throughout the hearing that *after* speaking directly with G. and E., it had determined forcing the teenagers to see Inna (or undergo therapy) would not do that and thus would not be in their best interests. The children's testimony, which the trial court found credible, brought to full light how deeply rooted the children's negative feelings toward Inna were. As minor's counsel observed, the children's stubbornness in their refusal to visit Inna had "taken on a life of its own"—it was "kind of their thing now."

Having interviewed the children itself and observed their demeanor, the trial court was in the best position to assess the children's credibility and state of mind. Considering that

23

testimony and the history of the case—and given G. and E. were 16 and almost 15—the court reasonably could find that, if "made" to visit Inna or to attend therapy, the children would become only more hostile toward and resentful of their mother, rendering reunification impossible. That of course would be detrimental to the children's well-being.

Inna notes, as she did below, that the trial court seemed to have based its orders just "on the children's testimony and [did] not pay[ ] much attention to the recommendations of [the] custody evaluation." The court was "giving weight to" the children's testimony, but it was not "disregarding Dr. Shirin's report entirely." Indeed, the court had again reviewed the report at the lunch break after the children's testimony. The court was aware of the report's observations and recommendations. Having weighed the children's testimony and the report, the court still did not think "having structure right now [w]as . . . in [the children's] best interest." We will not reweigh that evidence or substitute our own judgment for that of the trial court.

Inna also asserts the court's order was based on speculation that the children would return to Inna of their own accord. True, there was no guarantee the children would come around to Inna under the court's plan. But, the court didn't think its order was a magic bullet. The court had tried to get the children "thinking" about "why it's important to have a relationship with both parents" when it interviewed them. Nevertheless, the court understood "that's not going to flip a switch overnight in their heads."

Similarly, we can infer the court did not expect the children immediately to "buy in" to visiting with Inna when it removed the structured schedule from the visitation. Even if they didn't

24

however, the court reasonably could conclude that leaving the visitation unscheduled would be in G.'s and E.'s best interests—even if that meant they did not make time to see their mother right away.  Based on the record, the court reasonably could find mandating scheduled visitation would be counter-productive to the goal of reestablishing the children's relationship with Inna—they said as much.  We thus can infer an order of unstructured visitation would, at worst, have a neutral effect, so the children still would have a better chance of redeveloping a relationship with Inna than if visitation were forced.

We note minor's counsel "appreciated" the court's order and thought it "shows that the court is trying to do what the court believes is best for these children."

c.      *The court's order did not exceed the bounds of reason*

Inna argues that by "doing nothing" the court was not taking the " 'very aggressive approach to try and break down the[ ] walls that the children ha[d] built up' " that the court recognized was necessary, but instead was maintaining the "status quo of the children not seeing Inna because they choose not to."

First, we disagree that the court's order did nothing.  When it mentioned "doing nothing," the court was acknowledging Inna's frustration and explaining its decision not to force the children into structured visitation or therapy.  The court explained,

> "[T]hese cases are the trickiest we have.  They are.  They can leave us very frustrated because the impulse that we have as judges is to fix, do something.  Everybody wants us to do something.  Sometimes the best thing to do is to do nothing and just let time and space give

that.  Because I don't know what else to try at this point.  We've tried—I feel like we've tried varying levels of—."

(Based on the context, we can infer the court was referring to previously ordered structured visitation and therapy for the children.)

Although this approach seems to place reunification on the children's timetable—something the court at first did not seem to support—the court found that having "less strict orders" was the best way to accomplish the goal of repairing the children's relationship with Inna.  The court's decision to "back off . . . with making heavy-handed orders with these children" was not "doing nothing," however.

By removing the previous order requiring the children to go to Inna's based on the imposed schedule, the court was indeed doing something.  For one, the court was making it so the children no longer would be in a position of disobeying the court's orders.  The court reasonably could find that itself would be beneficial to their mental health.

More importantly, the court was trying to create space for these teenagers—whose "stubbornness" toward their refusal to visit had "taken on a life of its own"—*to change their minds* about Inna.  It was not unreasonable for the court to believe that, by taking away the children's constant "need" to refuse Inna, they would become less focused on their anger toward her.  The children might become more open at that point to accepting an *invitation* from Inna, for example, rather than having another

scheduled visit with her forced on them.[10]  In this sense, the court's order was geared toward breaking down the walls the children had erected in a step toward repairing their relationship with Inna.

Second, the court did not simply maintain the status quo, although it may have seemed like that to Inna.  The court's order was not limited to unstructured visitation.  The court ordered Inna and Roman to attend a high conflict co-parenting class *together*—as the custody evaluator had recommended—to show G. and E. that they believed it important for the children to have a relationship with *both* parents.  And, under the terms of their joint legal custody, Roman was ordered to co-parent with Inna. The court also ordered, seemingly from Roman's counsel's suggestion, Inna to participate in therapeutic sessions.  After she completed three—according to the minute order—the children were to be invited to join her.

The trial court had "the widest discretion" to choose a parenting plan that was in the best interests of the children. (§ 3040, subd. (d).)  Although perhaps unorthodox, we cannot say no court reasonably could have concluded this order advanced the best interests of the children or that it was outside the bounds of reason.  (*Burgess, supra*, 13 Cal.4th at p. 32; *In re Marriage of Connolly, supra*, 23 Cal.3d at p. 598.)

---

[10]     The court also ordered the children to ensure their mother was not blocked from reaching them on their mobile phones.

27

> d. *The court did not abuse its discretion by not considering consequences to impose on Roman or the children for missed visits*

Inna also contends the court should have considered imposing consequences on the children and Roman to motivate them to comply with the visitation order. As for the children, Inna seems to argue the court should have explored creative consequences "for the children's recalcitrance" before it removed the structured schedule from the visitation order. From what we can tell, Inna did not ask the court to impose a particular consequence on the children. She has thus forfeited the issue. (*Munro v. Regents of University of California* (1989) 215 Cal.App.3d 977, 988 [party may not raise on appeal issues not raised in trial court].)

As for Roman, it is unclear if Inna is arguing the court should have imposed consequences on him for the children's past failure to obey the court's visitation orders or to prevent future missed visits with Inna. As the parent, Roman could have imposed greater restrictions on the children if they did not visit Inna when scheduled.[11] At the hearing, the trial court told Roman everyone would be "counting on" him "to set the right tone" for the children. But at this stage, the court having determined forced time with their mother was not in the

---

[11] G. testified Roman took phone or computer privileges away when G. refused to visit Inna. At some point, Roman said he could not "make" the children go, however. As Inna had not had visitation with the children for 15 months, and counsel represents another 15 months have passed, we can infer Roman has not imposed meaningful consequences on the children.

28

children's best interests, we cannot say it was an abuse of discretion not to order Roman to produce the children. For the reasons we have discussed, the trial court reasonably could infer forcing the children to spend time with Inna to avoid penalizing their father would cause the children to resent Inna even more than they already did and further harm their relationship, undermining the purpose of the visitation.

     e.    *The court did not abdicate its responsibility*

Inna argues the court essentially abdicated its responsibility to decide custody issues by leaving it up to the children whether to visit Inna or not. The court's visitation order gave Inna reasonable visitation rights to be "arranged by mutual agreement of the parties." As Inna notes, because Roman would not "make" the children visit her unless they wanted to, the children essentially could decide whether to spend time with Inna or not.

We agree that is in essence the effect of the trial court's order. We find no error, however. The trial court determined forced visitation was not in the best interests of these teenagers. In making its order the court understood there was a "fine line between empowering [the children] too much versus giving them enough control where they buy into the idea" of having a relationship with Inna. That was precisely why the court was "eliminating the actual structural requirements about visits" —to give the children some control to foster an environment where the children would recognize the importance of having a relationship with Inna.

The authorities on which Inna relies, primarily juvenile dependency cases and authorities from other jurisdictions, are inapplicable or distinguishable. In dependency proceedings,

the juvenile court is statutorily required to provide visitation to parents as part of their reunification services when their child is removed; the court therefore must retain control over whether visitation occurs. (Welf. & Inst. Code, §§ 361.5, subd. (a), 362.1, subd. (a)(1); e.g., *In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1505 (cited by Inna) [juvenile court cannot "impermissibly delegate" to child's therapist or third party "unlimited discretion to determine whether visitation is to occur"; and child may not "be allowed to control whether visitation occurs"].) That is not the case here.

The other cases Inna cites are distinguishable and nonbinding. In *Matter of Miosky v. Miosky* (N.Y.App.Div. 2006) 33 A.D.3d 1163, 1166–1167, the trial court erred in ordering visitation subject to a 15-year-old's wishes where the record indicated visitation was in the child's best interest, and the custodial father had willfully interfered with the mother's right to visitation. Here, the court specifically found Roman had not overtly alienated the children or intentionally sabotaged the relationship.

In *Morgan v. Morgan* (N.C.App. 1974) 202 S.E.2d 356, 358, the court's order apparently granted father *specific* visitation rights but then stated, " 'That said visitations shall be subject to the consent of [the mother] and shall be discretionary with' " the child, who was 14 years old. The court concluded it was error "to allow the minor to dictate, at will . . . whether the judgment of the court is to be honored." (*Ibid.*) In other words, the order there included a specific schedule that the child could bypass. The court here purposefully removed the structural requirement. In *McFadden v. McFadden* (Mo.App. 1974) 509 S.W.2d 795, 800, the court found it "unwise to accord children the authority and

30

power to determine when they are to be placed in the temporary custody of" the noncustodial parent. There the noncustodial parent lived out of state and had visitation time for a two-week period between July 1 and September 1 each year and her sons could elect when and where she was to pick them up.

Finally, Inna contends that because the order in effect gave her no enforceable right to visitation, the court was required to make a finding of detriment to the children arising from the visitation. We agree there were no allegations or evidence of abuse, neglect, or other egregious behavior on Inna's part. The trial judge specifically told Inna that it was "not blaming her" for anything.

We do not agree the court had to find detriment on Inna's part before it could order unstructured visitation, however. As required by section 3100, the court found not forcing the children to spend time with their mother was in their best interests. The court reasonably could conclude that, at that time, forcing the children to visit Inna could irrevocably damage their relationship with her—not because of anything Inna was doing but because of the children's entrenched negative feelings toward her.

The situation here is thus distinguishable from the cases on which Inna relies. (See, e.g., *Messer v. Messer* (1968) 259 Cal.App.2d 507, 509–510 [error to allow mother to visit young daughter "only 'at the discretion of the [father],' " where there was no evidence mother's visits were detrimental]; *Camacho v. Camacho* (1985) 173 Cal.App.3d 214, 219 [error to condition right to visit child on payment of child support and indefinite counseling, and as there was no finding of detriment, it would be error to totally deprive parent of visitation].)

31

We recognize that leaving Inna's ability to visit with the children to a time mutually agreeable to all parties could result in the children opting not to visit Inna at all—they said as much to the court.[12] But, as the court explained to Inna, "I want the same thing you want. . . . I'm just trying to find a different way to get there." We cannot say the court's "way," considering the circumstances, "exceeded the bounds of reason." (*In re Marriage of Connolly, supra*, 23 Cal.3d at p. 598.)

3. ***The court did not abuse its discretion by not ordering the children to participate in reunification therapy***

Inna's opening brief notes that, "on January 24, 2022, the trial court ordered the children and parents into therapy with the goal of reunifying Inna and the children, with Roman to use his 'best efforts' to see that the children attend." We asked counsel to provide supplemental briefing as to whether this issue was moot. (See, e.g., *Santa Monica Baykeeper v. City of Malibu* (2011) 193 Cal.App.4th 1538, 1541 [concluding part of appeal moot based on postappeal events].) Counsel filed a supplemental letter brief on May 27, 2022, arguing Inna's challenge to the court's failure to order reunification therapy is not moot on the ground " 'material question[s] remain[ ] for the court's determination.' " (Quoting *id.* at p. 1548.) Counsel notes the therapy the court ordered post-appeal is not the same as what Inna requested at trial and on appeal, and does not include

---

[12] That in fact appears to have occurred based on the representation in the opening brief that Inna still has not spent any time with the children.

the type of enforcement mechanism she has argued on appeal is necessary. As of May 27, 2022, a joint session had not occurred.

We agree material questions remain and exercise our discretion to consider the merits. In doing so, we conclude the trial court did not abuse its discretion when it did not order the children to participate with Inna in the intense reunification/ alienation therapy that she had proposed.

As with the trial court's ruling on visitation, Inna again contends the trial court's refusal to order the children to participate in therapy was not in their best interests, but merely satisfied their wishes not to attend therapy and focused on the difficulty of enforcement. We do not agree.

To be sure, G. flat out told the court he would disobey any order to go to therapy, and E. said she would have to think about it. Both made clear they did not want to go. But, the court didn't deny Inna's request for intensive reunification therapy simply because her children didn't want to and said they wouldn't participate, but after finding it would not be in their best interests.

Based on the record, as with the visitation issue, the court reasonably could conclude that ordering the children to participate in the proposed therapy would serve further to entrench the children's negative feelings toward Inna, rather than help the children and parent reunify. After interviewing the children, the court believed the evidence of alienation was not "so strong as to warrant the type of intensive almost boot camp like approach" that Inna's counsel proposed. In the court's judgment, based on G.'s testimony, the intensive therapy counsel had in mind "is just going to have a bad result" and would be "very counterproductive."

More importantly, minor's counsel—who was "charged with" representing the children's "best interests" (§ 3151, subd. (a))—did not think the proposed intensive therapy would go well. He said that once his clients understood how intensive the therapy was going to be, "it's going to go south real quick."

After talking with the children, the court agreed with minor's counsel that whatever feelings the children had developed against mother due to the divorce had "really taken on a mind of their own that [was] disproportionate to the actual evidence of alienation." The court reasonably could conclude the children would feel greater resentment toward Inna if forced into the therapy, and given the evidence of alienation did not warrant the need for that type of therapy, the court reasonably could find it was not in their best interests.

Inna asserts the court "seemed to misconstrue the effect of alienation." She refers to the court's colloquy with her trial counsel where the court found the children credible and didn't get the sense they "had been programmed," and Inna's counsel noted the children would not necessarily be aware of the effects of parental alienation.

We can infer the court fully understood the potential effects of parental alienation. The court read and considered the custody evaluation report and even reviewed it again after the children's testimony. Indeed, the court appeared to agree somewhat with the report's conclusion that Roman was unaware how he might be affecting his children's withdrawal from Inna. Although the court did not find any evidence Roman had overtly alienated the children from their mother, it believed the children appeared to have internalized the conflict between their parents and their father's negative feelings toward Inna. The court was "conscious

34

of . . . how much the children t[ook] their lead from their father and how much they idolize[d] him," which it found "very telling."

Based on the children's testimony, which the court found credible, it concluded there was no evidence of actual alienation by Roman—e.g., that he spoke negatively about Inna to the children, or was actively trying to undermine their relationship.[13] Having directly questioned the children and observed their demeanor, the court did not find they had been "programmed." Deferring to the court's credibility findings, substantial evidence supports its finding that the evidence of alienation (or lack thereof) in this case did not support requiring the children to undergo intensive reunification/alienation therapy.

Although we are concerned by what appears to be the children's internalization of their father's negative feelings toward their mother, we cannot say the court could not reasonably have concluded its order was in the best interests of the children. Neither the court nor minor's counsel believed this type of intensive therapy would—at that time—be beneficial to the children and likely would work to further alienate them from Inna. Accordingly, we find the court did not abuse its discretion.

We recognize post-appeal events indicate the court's custody and visitation order has not worked as the court had hoped that it would. The children's rejection of Inna, and Roman's apparent acquiescence in their refusal to have a relationship with her, are troubling. Nevertheless, we cannot

---

[13] When the court asked, G. said their father encouraged them to visit Inna "all the time" to the point of being "annoying." E. testified similarly.

say the trial court's custody and visitation order lacked a reasonable basis given the circumstances at the time.

## DISPOSITION

The January 8, 2021 order is affirmed.  As respondent did not participate in this appeal, no costs are awarded.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



EGERTON, J.

We concur:



EDMON, P. J.



KIM, J.*

---